Filed 9/18/13  In re Z.L. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re Z.L., a Person Coming Under the Juvenile Court Law. | D063362 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ014625) |
| v. | |
| ANGELICA O., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Patrice Plattner-Grainger and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Angelica O. appeals following the six-month review hearing in the juvenile dependency case of her daughter, Z.L. Angelica contends the juvenile court made two erroneous findings: the San Diego County Health and Human Services Agency (the Agency) made reasonable efforts to provide reunification services and it would be detrimental to Z.L. to be returned home. We affirm.

BACKGROUND

When Z.L. was born in April 2012, she and Angelica tested positive for methamphetamine. Angelica admitted a history of methamphetamine use dating from her teenage years[1] but denied using drugs during pregnancy. She was on probation for possessing a controlled substance for sale and simple possession. She had little prenatal care. For the foregoing reasons, the Agency filed a dependency petition. Z.L. was detained in the hospital and then in a foster home. Social worker Monica DeVelasco was assigned to this case throughout the proceedings.

Z.L. was the unplanned offspring of a short relationship. From the beginning of the case, Angelica expressed frustration with and anger toward Z.L.'s father (the father). Angelica said she had trouble bonding with Z.L., who reminded her of the father. Angelica said she wanted to take care of Z.L. but did not know if she would be able to do so.

Angelica initially attributed the positive drug tests to others who smoked methamphetamine in her presence. She later admitted using methamphetamine three times at the end of her pregnancy. Four days after Z.L.'s birth, Angelica had a negative drug test. All of her later tests were negative.

---

[1] Angelica was in her early 30's when Z.L. was born.

2

At the detention hearing, the court ordered supervised visitation and authorized the Agency to provide referrals to voluntary services. In late April 2012, DeVelasco gave Angelica referrals to services including therapy, parenting classes and Narcotics Anonymous (NA) meetings. In early May, DeVelasco referred Angelica to a parent partner and Community Services for Families for parenting instruction. Angelica also agreed to participate in voluntary services for her three older children, who remained in her care. On May 2, Angelica attended her first NA meeting. The Agency reported Angelica was "very proactive in getting the services and the help she needs in order to have [Z.L.] return under her care but has not visited much."

On May 10, 2012, the court made a true finding on the petition. On May 14, Angelica began outpatient treatment at the North Inland Recovery Center. On May 30, the court ordered Z.L. removed from Angelica's custody and placed in a foster home. The court ordered short unsupervised daytime visits, and gave the Agency discretion to allow overnight and weekend visits with notice to Z.L.'s counsel, and a 60-day visit with the concurrence of Z.L.'s counsel. The court ordered reunification services for Angelica, including individual therapy with an approved therapist, parenting education, drug testing and NA meetings. Angelica began meeting with a parent partner in May and completed that service in six weeks. Angelica's visitation remained inconsistent; sometimes she visited at least two or three times a week, and sometimes a week passed without a visit.

In June 2012, Z.L. was moved to the home of a maternal aunt (the aunt) who lived near Angelica. In July, Angelica began participating in parenting classes at Community Services for Families. She missed some classes, but her participation was otherwise consistent.

3

Angelica did not start therapy until September 2012 because the therapist's availability was limited and Angelica delayed in calling for an appointment.  Angelica attended one or two sessions then missed a session in late September.  In October, her older children were ill and she did not visit Z.L. for a week or two.  On October 29, Angelica told the Agency she did not feel "connected" to her therapist and did not wish to continue working with her.  On October 31, the therapist reported that Angelica's "[uncertainty] . . . whether or not she wishes to keep [Z.L.]" was an obstacle to therapy.  On November 8, the Agency found a new therapist for Angelica.  Angelica attended one to three sessions with the new therapist.

According to the Agency's six-month review report, prepared on November 19, 2012, Angelica said she was overwhelmed with caring for her nondependent children, with her own health issues and with legal matters.[2]  Angelica believed she would benefit from six more months of services and said Z.L. should remain with the aunt.  The Agency recommended that Z.L. remain with the aunt and Angelica receive six more months of services, including therapy, parenting classes with "hands on time" and overnight visits.

THE SIX-MONTH REVIEW HEARING

The hearing took place on January 22 and 23, 2013, when Z.L. was nine months old.

*Testimony of Social Worker DeVelasco*

Angelica completed her substance abuse program and continued to drug test with negative results, so her drug use was no longer a protective issue.  She continued to attend parenting classes and the current portion of the course, infant-parent interaction, focused on

---

2    In April 2012, Angelica was hospitalized for eight days.  She said she had "[a] blood clot" and "kidney failure."  There was litigation in family court concerning the custody of one of her older children.

4

bonding. The last report from the parenting instructor, in December 2012, was positive, with no bonding issues raised. However, the week before the hearing, Angelica again said she had trouble bonding with Z.L. Angelica said therapy had been helpful but she had attended only three or four sessions in six months. She had not completed the therapy and parenting components of her reunification plan. She had completed voluntary services for her three children who were eight, four and two years old.[3]

In the month before the hearing, there were two or three overnight visits with no negative reports. Angelica had not taken advantage of the opportunity for additional overnight visits. She did not have a crib for Z.L. and usually visited Z.L. at the aunt's home. Angelica said she did not want further services and she would care for Z.L. with help from the maternal grandmother (the grandmother) rather than from the Agency.

DeVelasco was concerned that Angelica could transfer her anger at the father to Z.L. DeVelasco believed further therapy could help Angelica deal with the issues underlying her feelings for Z.L. and help her bond with Z.L. DeVelasco had recently suggested Parent Child Infant Therapy (PCIT) to Angelica, but she had rejected the suggestion. DeVelasco believed Angelica presented a risk to Z.L., and not to her two-year-old child, because Angelica was not bonded to Z.L. and Z.L. had different needs, required a different sleeping arrangement and was unable to walk, talk and express herself. Z.L. had not spent a significant amount of time with Angelica, so DeVelasco was concerned that a transition into Angelica's care would be difficult for Z.L. DeVelasco concluded it would be detrimental to Z.L. to be returned to Angelica.

---

[3] The older children had been in Angelica's care except for a three-month period when she was in jail as a condition of probation.

*Angelica's Testimony*

Angelica did not wish to continue with services.  She wished to care for Z.L. with help from the aunt and the grandmother, who were supportive of Angelica and her children, and without the pressure of the Agency telling her what to do and when to do it.  The Agency's services interfered with Angelica's routine and prevented from her pursuing other goals.  She intended to find a therapist, continue therapy and NA and learn job skills.  Angelica denied having a history of drug use, aside from her drug use during pregnancy.

Angelica was bonded with Z.L., never had trouble soothing her when she was upset and never became angry enough to hurt her.  Angelica had difficulty expressing herself and DeVelasco misunderstood her.

Angelica was not in therapy.  The therapist said she would not change another patient's schedule to accommodate Angelica, and Angelica should find a babysitter for her three children.  Angelica asked DeVelasco for help, and DeVelasco said she would speak with the therapist.  The Agency provided childcare for two of Angelica's older children while she attended drug classes about a month before the hearing.

Overnight visits began on November 29, 2012.  There had been "a little more than two or three" such visits.  When Z.L. spent the night with Angelica, they slept on an air mattress on the floor so Z.L. would not fall off the bed.  Angelica bought a crib for Z.L.; the crib was at the aunt's home, and if Z.L. were returned to Angelica's care, the crib would be moved to Angelica's home.  The crib could not be moved back and forth, and the grandmother was concerned about Z.L. sleeping on the air mattress, as Z.L. was very active.

*The Court's Ruling*

The court found that returning Z.L. to Angelica would create a substantial risk of detriment to Z.L.'s physical and emotional well-being; the Agency had complied with the case plan by making reasonable efforts to return Z.L. to a safe home and obtain a permanent placement; Angelica had been provided or offered reasonable services; and she had made good progress on her case plan. The court continued Z.L.'s relative placement and Angelica's reunification services; identified a return home as Z.L.'s permanent plan; and set a 12-month review hearing.

## DISCUSSION

*Reasonable Efforts*

Angelica argues the court erred by finding the Agency made reasonable efforts to provide her services. She raises five contentions regarding the Agency's efforts. First, the Agency was late with a therapy referral. Second, the Agency did not provide child care for Angelica's older children so she could attend therapy and parenting classes. Third, the Agency did not provide a crib so Z.L. could spend the night with Angelica safely and more frequently. Fourth, although Angelica had serious medical problems, the Agency did not provide respite care so she could rest. Fifth, the Agency did not provide housing assistance. We reject Angelica's contentions.[4]

Absent exceptions inapplicable here, the state must "make reasonable efforts to reunify a family." (*In re Ethan C.* (2012) 54 Cal.4th 610, 634, fn. 16.) At each review hearing, the court must determine "[t]he extent of the [A]gency's compliance with the case plan in making

---

[4]     In her reply brief, Angelica argues some of her services did "not involve any time or financial outlay by the Agency." Even if true, this is not dispositive.

7

reasonable efforts . . . to return the child to a safe home and to complete any steps necessary to finalize the permanent placement of the child, . . . consistent with the child's best interests." (Welf. & Inst. Code, § 366, subd. (a)(1)(B).)[5]  At the six-month review hearing, "[i]f the child is not returned to his or her parent . . . , the court shall determine whether reasonable services that were designed to aid the parent . . . in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent . . . ."  (§ 366.21, subd. (e), 8th par.)

When the court orders reunification services, the "[A]gency is required to make a good faith effort to address the parent's problems through services, to maintain reasonable contact with the parent during the course of the plan, and to make reasonable efforts to assist the parent in areas where compliance proves difficult.  [Citation.]  However, in most cases more services might have been provided and the services provided are often imperfect.  [Citation.]  'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' "  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599, quoting *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  "We determine whether substantial evidence supports the trial court's finding, reviewing the evidence in a light most favorable to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling." (*Katie V.*, at p. 598.)

The record belies Angelica's argument that the Agency delayed in referring her to a therapist.  DeVelasco gave her referrals even before the court ordered reunification services.  Angelica delayed calling for an appointment.  Months later, she began therapy, but quit after a

---

5       All further statutory references are to the Welfare and Institutions.

few sessions.  She told DeVelasco she did not want to continue seeing the therapist, and within 10 days DeVelasco found a new therapist.

There is no evidence Angelica communicated a need for another crib or respite care. She knew the Agency was willing to provide childcare services, as it had already done so.  The aunt and the grandmother also helped Angelica with her children, and Angelica testified that DeVelasco promised to speak to the therapist about childcare needs.  There is no " 'requirement that a social worker take the parent by the hand and escort him or her to and through [services].' "  (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233, quoting *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)

Housing assistance was not an element of the reunification plan, and it is too late for Angelica to challenge the plan.  (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811.) "If [Angelica] felt during the reunification period that the services offered her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan:  ' "The law casts upon the party the duty of looking after his [or her] legal rights and of calling the judge's attention to any infringement of them.  If any other rule were to obtain, the party would in most cases be careful to be silent as to his [or her] objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." [Citation.]' [Citation.]"  (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) Neither Angelica nor her trial counsel sought adjustment of the case plan before the six-month review hearing, or complained that services were unavailable.

Substantial evidence supports the reasonable efforts and reasonable services findings.

DETRIMENT

"At the [six-month] review hearing . . . , the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  The social worker shall have the burden of establishing that detriment. . . .  The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental.  In making its determination, the court shall review and consider the social worker's report and recommendations . . . ; and shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself to services provided . . . ."  (§ 366.21, subdivision (e).)  We review the detriment finding for substantial evidence.  (*In re Alvin R*. (2003) 108 Cal.App.4th 962, 974.)

In finding detriment, the court here stated:  "The statute does indicate there's a prima facie showing that the parent is not consistently in therapy, that's been established in this case, and there's no evidence that it is overcome -- that provision."  Angelica contends the court mistakenly believed that her failure to complete the therapy portion of her case plan mandated a prima facie finding, although the detriment finding should have been based on her overall

progress with the plan, which the court characterized as "good."[6] Alternatively, Angelica argues she rebutted the prima facie showing. She is incorrect.

The only parts of the plan Angelica finished were those related to substance abuse. She did not complete therapy or parenting education and did not visit consistently. This constitutes substantial evidence that Angelica failed "to participate regularly and make substantive progress in" services. Thus, there was a prima facie showing of detriment that was not rebutted[7] and there is no infirmity in the detriment finding.

DISPOSITION

The order is affirmed.

BENKE, Acting P. J.

WE CONCUR:


McINTYRE, J.


IRION, J.

---

[6]    Angelica speculates the court may have relied on California Rules of Court, rule 5.708, which states: "Failure of the parent . . . to regularly participate and make substantive progress in *any* court-ordered treatment program is prima facie evidence that . . . return would be detrimental." (Italics added.) The court did not cite this rule and we need not discuss it.
    Angelica also argues the court did not make the required finding regarding the extent of her "progress . . . toward alleviating or mitigating the causes necessitating placement in foster care." (§ 366, subd. (a)(1)(E); Cal. Rules of Court, rule 5.708(i)(3).) Although the court did not make an express finding, it discussed Angelica's progress with her case plan and her "[work] on the substance abuse issues," the primary factor that led to Z.L.'s foster care placement. There was no error.

[7]    In view of our conclusion, we need not address Angelica's contention that the detriment finding is unsupported by substantial evidence, or her assertion that "no substantial evidence supports finding that bonding is an issue preventing the safe return of the child to the home."